```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA        .  CR. NO. H-06-421-2
                                     .  HOUSTON, TEXAS
 4   VS.                             .
                                     .  OCTOBER 22, 2010
 5   ADNAN BABAR MIRZA               .  10:16 A.M. to 11:23 A.M.

 6

 7                      TRANSCRIPT of SENTENCING
                BEFORE THE HONORABLE EWING WERLEIN, JR.
 8                   UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:

11   FOR THE GOVERNMENT:            MR. GLENN COOK
                                    MR. JIM MCALISTER
12                                  Office of the U.S. Attorney
                                    1000 Louisiana
13                                  Suite 2300
                                    Houston, Texas   77002
14

15
     FOR THE DEFENDANT:             MR. DAVID ADLER
16                                  MS. SUE JANA
                                    Attorneys at Law
17                                  6750 W Loop S
                                    Suite 120
18                                  Bellaire, Texas   77401

19

20   OFFICIAL COURT REPORTER:       MS. KATHY L. METZGER
                                    U.S. Courthouse
21                                  515 Rusk
                                    Room 8004
22                                  Houston, Texas   77002
                                    713-250-5208
23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

1

2          *THE COURT:*  Please be seated.

3               The Court calls for sentencing No. 06-421, United

4    States versus Adnan Babar Mirza.

5          *MR. COOK:*  For the United States, Your Honor, Glenn

6    Cook and Jim McAlister.

7          *THE COURT:*  Thank you.  And for defendant?

8          *MR. ADLER:*  I'm sorry.  Good morning, Your Honor.

9    David Adler for Mr. Mirza, who's present in the courtroom.

10         *THE COURT:*  Good morning, sir.

11              It's correct, is it not, that the defendant was

12   adjudged guilty of Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the

13   second -- let's see, was this the -- of the superseding

14   indictment by verdict of the jury?

15         *MR. ADLER:*  Yes, it is, Your Honor.

16         *THE COURT:*  And have you received and read and had

17   opportunity for your client to receive and read and discuss

18   with you the presentence investigation report from the

19   probation officer?

20         *MR. ADLER:*  We have, Your Honor.

21         *THE COURT:*  All right.  I have received in connection

22   with this sentencing the presentence investigation report from

23   the probation office, received and read all of the following,

24   that and the statement of the government at Document 267 that

25   it has no objections; the government's response to the

1  defendant's objections at Document No. 269; the government's

2  objections to the defendant's character letters at Document

3  No. 274; the defendant's objections to the PSR at Document

4  No. 268; the defendant's character letters at Document 273; an

5  additional character letter received this morning, filed

6  August 24, written in support of Mr. Mirza; the addendum to the

7  presentence report from the probation office dated October 13,

8  2010.

9            Are these all of the matters that have been filed

10 in connection with this sentencing?

11           MR. ADLER:  I believe so, Your Honor.

12           MR. COOK:  For the government, yes, Your Honor.

13           THE COURT:  All right.  Thank you.  I will rule on the

14 objections then.

15           The government has no objections.

16           The defendant's first objection is to page 1,

17 correcting the date of sentencing to this date, and that's

18 accepted and sustained.

19           Second, the defendant at Paragraph 12 clarifies

20 that he does not believe that all who are born into Black

21 Panther families are Muslims.  That's accepted as clarifying

22 information.

23           Paragraph 14, objecting that the defendant did

24 not become an undocumented alien when his student visa expired.

25 That is correct information.  That should be reformed to show

1   that the defendant -- the visa is, as the defendant has pointed

2   out, a document required to present for admittance to the

3   United States.   However, in this instance the defendant had an

4   F-1 student visa and when he accepted employment and took

5   employment, as the evidence showed and as the Court finds, away

6   from the campus, he was out of -- violated the terms and

7   conditions of the visa and, therefore, he became an alien

8   illegally or unlawfully in the United States.   His status,

9   therefore, changed.   With that correction, the objection is

10  otherwise denied -- in part granted to that extent, otherwise,

11  denied.

12          There's an additional objection to Paragraph 14,

13  believing that his codefendant, Williams, did not make the

14  announcement described in that paragraph.   That is accepted as

15  clarification of the defendant's recollection.

16          The fourth objection as to Paragraph 16, to the

17  effect that the defendant did not recall making the statements

18  described at the end of Paragraph 16, that's accepted as a

19  statement of his failure to recall that.

20          The next objections to Paragraphs 17 and 18,

21  objecting that these -- the material here is irrelevant.   Both

22  of those objections are denied.

23          The next objection -- objections at Paragraph

24  7 -- Nos. 7 and 8 are to Paragraphs 19 and 20, arguing that

25  these paragraphs do not accurately convey the context of the

1  conversations.  There are quite a number of those.  I'll come

2  to others.  The PSR, of course, is a summary of the

3  information.  The Court heard the evidence at trial and finds

4  that the conversations are adequately set forth in the context.

5  There could always be a larger context, I suppose, but these

6  objections are denied.

7                Paragraph -- the next objection is to Paragraph

8  21.  It's the same as the previous objection, with the same

9  ruling for the same reason.  But additionally, there's an

10  objection that the defendant believes he did not indicate that

11  the -- that he believes his word was that the court -- that the

12  reporter or journalist would be an excellent guide, not guise,

13  as had been suggested by his codefendant.  And that's accepted

14  as the defendant's recollection of the word he used, although

15  the transcript would be the best evidence of that.

16                The next objections 10 -- Nos. 10 through 21 are

17  to Paragraphs 22 through 27, 29 through 32, 37 and 39, all of

18  which are statements that the defendant's belief that the

19  context of the conversations are not accurately conveyed.  That

20  is -- those are denied for the reasons previously stated.  The

21  Court finds that there's adequate context provided.

22                The next objection, No. 22, is to Paragraph 40,

23  objecting that the defendant was not out of status due to his

24  visa having expired.  That is sustained and clarified as

25  follows:  As I had previously stated, the defendant was out of

```
 1  status because he had violated the terms of his F-1 student
 2  visa by taking gainful employment off campus, away from campus,
 3  in violation of the terms upon which he was admitted to the
 4  United States.
 5              The next objections, 23, 24 and 25, are to
 6  Paragraphs 41, 42, and 43, object -- which are relevancy
 7  objections.  Those are all denied.
 8              The next objections, 26 through 29, are to
 9  Paragraphs 44, 45, 47, and 48, respectively objecting, once
10  again, to conversations -- the information not accurately
11  conveying the context of the conversations reported.  For the
12  reasons previously stated, those objections are denied.
13              Paragraph 30 -- rather, Objection 30 as to
14  Paragraph 52, objecting that the assistance was for -- the
15  financial assistance that had been collected and delivered was
16  for families of the Taliban, not Taliban members.  Statements
17  to that effect -- or some statement -- some evidence was to the
18  effect that it was for families, but there was no distinction
19  drawn in the evidence between Taliban and family members of
20  Taliban certainly.  And, further, the Court finds that the
21  assistance to any portion of the Taliban or their families of
22  assistance to the Taliban certainly is supported by the
23  evidence.  And that objection is clarified -- or the response
24  there for clarification, and the objection is otherwise denied.
25              Now, all of the objections heretofore that have
```

1    been made and ruled upon have no bearing on the guideline.

2              Paragraph -- the objection, No. 31, as to

3    Paragraph 6, objecting to a 12-level increase under Section

4    3A1.4, which also has bearing upon the criminal history

5    category, from I to a criminal history category VI, the

6    defendant objects that there was no evidence that the

7    defendant's offenses involved or were intended to promote any

8    terrorism offenses in Section 32 -- 2332b(g)(5) and that the

9    indictment does not contain any reference to a listed terrorism

10   offense.

11             Do either counsel wish to speak any further on

12   that particular matter?  I have the briefs of the submission of

13   the defendant and the brief of the government as well.

14        MR. ADLER:  I have nothing other than what I put in

15   the objection, Your Honor.

16        MR. COOK:  And I believe our brief adequately

17   addresses the issue, Your Honor.

18        THE COURT:  The Section 3A1.4 terrorism section of the

19   guidelines provides that if the offense is a felony that

20   involved or was intended to promote a federal crime of

21   terrorism, increase by 12 levels.  And that in such a case, the

22   defendant's criminal history category would be set at category

23   VI.

24             The Court has given careful consideration to

25   this.  It is an accurate statement that the defendant has made,

1   that there's not a direct reference in the indictment to

2   Section 2332b(g)(5) where the term "federal crime of terrorism"

3   is described, but the Section 3A1.4 of the guidelines speaks to

4   a felony that involved and then it has in the disjunctive "or

5   was intended to promote a federal crime of terrorism."  There

6   are -- I have not found or it is not cited a case from the

7   Fifth Circuit dealing with this, but several Circuits have

8   dealt with it.  And the Court finds probably the clearest

9   statement and most helpful statement analyzing this section of

10  the guidelines in *United States versus Awan* at 607 F.3d 306,

11  Second Circuit case decided earlier this year, on June 10th.

12          The court pointed out that this disjunctive use

13  of the language in Section 3A1.4 requires an analysis first of

14  the word "involved," which is a federal crime of terrorism and

15  this offense includes such a crime, that is, the defendant

16  committed, attempted, or conspired to commit a federal crime of

17  terrorism as defined in Section 2332b(g)(5) or his relevant

18  conduct includes such a crime.

19          The other in the disjunctive, as I say, the other

20  part of this section deals with that which is intended to

21  promote such a crime.  And the Second Circuit has written at

22  page 314, that the intended to promote prong applies where the

23  defendant's offense is intended to encourage, further, or bring

24  about a federal crime of terrorism even though the defendant's

25  own crime of conviction or relevant conduct may not include a

1    federal crime of terrorism.  And, further, at the same page,
2    under the intended to promote prong, "However, so long as the
3    defendant's offense was intended to encourage, further, or
4    bring about a federal crime of terrorism as statutorily
5    defined, the defendant himself does not have to commit an
6    offense listed in 2332b(g)(5)(B) and the defendant's offense
7    need not be calculated as described in 2332b(g)(5)(A)."

8             And then they provide the summary at page 315 as
9    follows:  That we confirm what we noted in *Stewart* and join the
10   other Circuits that have held that a defendant who intends to
11   promote a federal crime of terrorism has not necessarily
12   completed, attempted, or conspired to commit the crime; instead
13   the phrase implies that the defendant has as one purpose of his
14   substantive count of conviction or his relevant conduct the
15   intent to promote a federal crime of terrorism.  It follows
16   that Section 3A1.4 may apply without a showing that the
17   defendant's conduct constitutes an offense listed in 18 U.S.C.
18   Section 2332b(g)(5)(B) or satisfies the calculation requirement
19   set forth in Section 2332b(g)(5)(A).

20            Now, that answers the question of the objection
21   made by the defendant that there was not an allegation of an
22   offense specifically under Section 2332b(g)(5).  The question
23   then is whether the offense of conviction in the substantive
24   count and the relevant conduct associated with that conduct was
25   intended or had as one of its purposes the intent to promote a

1    federal crime of terrorism.

2              And the government has set forth quite a number

3    of portions of 2332b(g)(5) which they feel, argue may be

4    applicable.  And, indeed, cases could be made and can be made

5    with respect to a number of these subparts of the statute.  For

6    example, number -- well, first, let me mention under (5)(A),

7    the offense, it's calculated to influence or affect the conduct

8    of government by intimidation or coercion or to retaliate

9    against government conduct.  This group known as the Taliban or

10   the Mujahideen clearly are involved in such conduct and is a

11   violation of section -- and various sections are

12   possibilities -- Section 956(a)(1) relating to conspiracy to

13   murder, kidnap, or maim persons abroad; Section 1114, relating

14   to killing or attempted killing of officers and employees of

15   the United States; Section 2332, relating to certain homicides

16   and other violence against United States nationals occurring

17   outside the United States; Section 2332b, relating to acts of

18   terrorism transcending national boundaries; Section 2339(B),

19   relating to providing material support to terrorist

20   organizations; and perhaps the government has argued others as

21   well.

22             The Court finds from a preponderance of the

23   evidence that at least a Section 2332 relating to certain

24   homicides and other violence against the United States

25   nationals occurring outside of the United States is conduct in

1   which the Taliban is engaged.  And certainly the Taliban itself

2   is removed from any kind of official status, which has also

3   been recognized in *United States versus Lindh*, 212 F.Supp.2d

4   541, cited in the Eastern District of Virginia.

5              The defendant and others were engaged in the

6   violations of these substantive firearm violations in

7   connection with participating in paramilitary operations near

8   Willis, Texas, intended to improve marksmanship, survival

9   skills in preparation for battlefield jihad overseas.  They

10  have a declared goal of traveling to Pakistan and Afghanistan

11  to fight alongside the Mujahideen against the United States

12  military and coalition forces in the Middle East and in that

13  region.

14             They discussed various ways in which they might

15  successfully enter that area in Pakistan -- through Pakistan in

16  order to join up with the forces and Taliban fighters.  They

17  collected financial and material support which they then

18  undertook to deliver to support the Taliban or Taliban

19  families.

20             All of this conduct on the offense of

21  conviction -- offenses of conviction were intended to promote

22  in accordance with the analysis that I've given federal crimes

23  of violence.  And, accordingly, the objection to application of

24  Section 3A1.4 is denied.  I find that it is properly applied in

25  the presentence investigation report.

1          The next objection is No. 61 -- I beg your

2     pardon, No. 32 to Paragraph 61, objecting that the defendant

3     should have a role adjustment as a minor participant.

4          That is denied.  The defendant had a full --

5     certainly what would be regarded as an average role at least in

6     this operation.

7          The next two objections I believe, Mr. Adler, 33

8     and 34, are computation objections based upon the previous

9     objections that you made.  And I'll deny those for the reasons

10    previously stated.

11         Objection 35 is to Paragraph 75, providing

12    corrected information regarding when Mirza and his family

13    returned to Kuwait and they lived there until 2000, and giving

14    the correct age of his sister, her family or so.  That's all

15    accepted as clarifying information.

16         What is that bell?  Whoever has that bell needs

17    to remove -- take that, marshal, and take that outside the

18    courtroom.

19         Number 36 states that the defendant is South

20    Asian, not Middle Eastern.  That's accepted as clarifying

21    information.

22         The next two objections, 37 and 38, correct the

23    spelling of Cypress College in Paragraph 82 and the correct the

24    spelling of Mr. Badat's name in Paragraph 84.  Those are

25    accepted.

1              Paragraph -- objection 39 at Paragraph 86,

2    objects -- or states that the defendant believes that the

3    $9,311 in debt collection status may include $5,000 separately

4    mentioned in the next following sentence.  And that's accepted

5    as additional information.

6              Objection 40 to Paragraph 90 is a computation

7    objection.  Again, it's denied for reasons previously stated.

8              No. 41 addresses Paragraphs 106 and 107.  This is

9    argument for downward departure or a sentence variance based

10   upon alleged government manipulation.  I'll permit that to be

11   advanced -- to be advanced in argument during the allocution.

12             Have I ruled on all of the objections?

13        *MR. ADLER:*  You have, Your Honor.

14        *THE COURT:*  Then based upon the presentence

15   investigation report and the addendum thereto, which I adopt

16   with the changes or clarifications and corrections made on the

17   record, I find that the total offense level is 38, criminal

18   history category is VI.  Recommended period of imprisonment

19   under the Sentencing Guidelines is for 360 months to life.

20   Fine range recommended, 25,000 to $250,000.

21             Very well, Mr. Adler, do you wish to make a

22   statement for the defendant?

23        *MR. ADLER:*  Yes, Your Honor.  Mr. Mirza stands before

24   the Court facing an enormous sentence, essentially the second

25   highest sentence you can receive under the Sentencing

1  Guidelines, 30 years to life.  I hope the Court will consider

2  strongly the language in 3553 that says the sentence should be

3  no greater than necessary than to meet the objectives of the

4  sentencing statute.

5          The facts of this case, Judge, are that there was

6  no target, there was no specific plan.  No steps were taken, of

7  course, in furtherance of a specific target or executing a

8  specific plan.  Mr. Mirza and his associates were out in the

9  woods in Willis, shooting guns on the weekend and talking

10 tough.  That's what the evidence at trial showed.

11         Mr. Mirza clearly is frustrated with the way the

12 political situation is in Pakistan and Afghanistan and the

13 United States, but there was no specific plan to do any damage

14 to any particular individual nor any particular building.

15         I point out, Judge, that just last week up in

16 Dallas, an individual involved in an FBI operation was provided

17 a truck that he believed contained a bomb.  And he drove that

18 to a building in Dallas with the intent of destroying that

19 building and killing and maiming as many people as possible.

20 That individual received a 24-year sentence.  Mr. Mirza under

21 the guideline calculations is looking at a 30-year sentence,

22 with no explosives, no belief he had explosives, no truck, no

23 target, no particular intended victim.

24         I don't dispute the evidence at trial, Judge,

25 that Mr. Mirza was recorded talking about what -- depending on

1  how you interrupt the conversations, what he would like to see

2  happen or what they might do.  But I point out, Judge, that

3  Mr. Mirza stayed here in Texas.  He stayed in the Southern

4  District.  He did not go back to these areas of Pakistan or

5  Afghanistan despite all the tough talking around the campfire.

6  And, in fact, Mr. Mirza -- it wasn't even Mr. Mirza's idea to

7  go out into the woods and shoot these guns.

8           My point, Judge, is that 30 years in the United

9  States federal penitentiary should be reserved for the most

10  serious offenses, not for an individual who stupidly violates

11  the conditions of his visa, according to the evidence, and

12  talks tough around the campfire.  The fact is, Judge, talking

13  tough around the campfire is an age old Texas tradition.

14  Probably very few men who have been around a campfire out in

15  the woods have said things that they wouldn't later on regret

16  if it was recorded, played to their wives or their colleagues.

17           The discussions that Mr. Mirza and the other

18  individuals in the case had are sometimes disturbing, I don't

19  dispute that, but they certainly don't warrant a 30-year

20  sentence or more.  And, so, I hope the Court will either depart

21  downward or vary the guideline range to a sentence that more

22  adequately reflects Mr. Mirza's conduct in this case in light

23  of these other terrorism cases where people have taken much

24  more concrete, much more dangerous steps to hurt other

25  individuals.

1          I know Mr. Mirza wants to address the Court as

2   well, Your Honor.

3          *THE COURT:*  Thank you, sir.

4          Mr. Mirza, do you wish to make a statement on

5   your own behalf, sir?

6          *THE DEFENDANT:*  Yes, sir.  I do understand that this

7   is a sensitive issue, not only for people in this room but

8   outside as well.  I myself personally do not -- have never

9   intended to harm any individual, let alone anything else.  What

10  we do not know, in my opinion, to this -- right now is that the

11  people who I was with, my codefendant, Mr. Williams, the

12  confidential informant and the undercover, my belief has always

13  been -- I've known Mr. Williams since 2001, and we've been

14  involved in a lot of activities together, volunteering and

15  stuff.  And I've also known the confidential informant.  But

16  we've always treated Mr. Williams as somebody who is

17  intellectually disabled.  We have never taken anything

18  seriously about Mr. Williams.  But with people who are

19  intellectually disabled, it's very hard --

20         *THE COURT:*  Intellectually what?

21         *THE DEFENDANT:*  Disabled.

22         *THE COURT:*  Disabled?

23         *THE DEFENDANT:*  Yes.  Yes.  I mean, in my opinion, I

24  think Mr. Williams, if he ever gets psychiatrically evaluated,

25  I mean, the evaluation would point out that he either has

autism or Asperger's syndrome, which is a type of autism
spectrum disorder.

          And when -- if you look at the PSI report, which
was compiled by the probation officer, on the Paragraph 13, it
states that when the FBI first approached Mr. Williams at home,
his wife actually slammed the door on the FBI and urged
Mr. Williams not to talk to the FBI without the presence of an
attorney.  It's kind of natural, like, when we know somebody
who's very gullible and very misunderstood, we try to protect
that individual.  I mean, it doesn't happen in a conventional
way, but we try our best.  It's just like dealing with an
individual with, like -- I mean, a kid probably, like, 12 years
old, 13 years old or maybe younger, who doesn't understand the
consequence of his or her actions.

          I mean, today we do not know this for a fact,
that Mr. Williams has autism or Asperger's, but I believe that
one day if he ever gets evaluated and it does come true, then
whatever I did, which should be seen as something that I did to
the best of my abilities to stop Mr. Williams from acting on
the ideas that were instigated by the confidential informant
and the undercover officer.  This is -- I'm convinced deep down
inside that this has been the case.

          I've never -- I mean, I've only lived, like, four
years of my life in Pakistan and that was during the first Gulf
War.  I do not have a whole lot of relatives or -- in Pakistan.

1   My family's pretty much has been either in Kuwait or Dubai.

2               And when they first approached me, the only

3   rationale that they had was that because I was -- I had a

4   Pakistani passport, that is why I should know about Pakistan,

5   but it wasn't true.  I mean, any other sane person would know

6   that.  I mean, if a person hasn't lived anywhere, like, in

7   adulthood, I mean, how is he supposed to know the details or

8   he's an expert on things.

9               I just tried my level best to make sure that

10  Mr. Williams doesn't -- doesn't try to leave the country.  I

11  could not stop him from going to camping trips, but I tried to

12  stay with him so that, I mean, at least if I was there, I could

13  stop him from doing something that could be harmful.  I did

14  that in the best interest of mankind in general.  I mean, when

15  I look at things, I try to do it for humanity, I mean.  And

16  when I look at people, I don't look at their race, culture,

17  creed, language, or anything.  To me a human being is a human

18  being.  Every soul -- no soul has a color or anything.

19              I mean, I was taught by my teachers.  I've lived

20  in four different countries, and I have friends and family in

21  almost every continent except for Antarctica, but, I mean,

22  they're living in societies, I mean, and I just know people

23  from everywhere.  But I like everyone.  I respect everybody,

24  and I do not intend to harm any -- any individual.

25              Whenever -- when I was in Houston, I tried to do

1   the best I could to help the most needy persons of this

2   society.   I've done that wherever I've been.   If I had the

3   opportunity to do so, I do it.   But I want you to -- I mean, I

4   don't -- I don't know why it has never been brought up.   I

5   mean, I did discuss this with my attorney, but it was

6   considered as a frivolous claim.   But this is what it is, I

7   mean.   I never ever intended to harm any, any individual.

8          And I even sacrificed -- I mean, I was -- in the

9   response that the government has to the -- to our objections,

10  it's mentioned that I have never -- I didn't -- I was here for

11  five years, that I didn't complete my degree.   But it should be

12  noted that my investigation started in early 2004.   And by then

13  I was about to transfer my credits to a university in

14  Minnesota, but I was -- I had to stay, because it was, like,

15  Mr. Williams, I just couldn't -- I just couldn't leave him like

16  that.   I mean, nobody else was doing anything.   Everybody we

17  knew just went -- when they tried to advise Mr. Williams, he

18  just would shun them and not -- I saw this and I just

19  couldn't -- you know, I had to try something else.

20          And if it was -- I believe if it wasn't for me, I

21  mean, Mr. Williams -- and if Mr. -- if the codefendant or the

22  undercover officer were real people who, you know, who were,

23  like, terrorists or -- I mean, Mr. Williams could have been --

24  could have done something that could have harmed people, but I

25  wasn't convinced.   I wasn't convinced that Mr. Williams can be

1    a leader.  He just follows people.  I mean, things just trigger

2    him somehow and his response is not normal.

3                 And if, like I said earlier, like, if it is

4    proven that Mr. Williams had -- has Asperger's and -- or

5    autism, then, I mean it should be considered that I tried my

6    best to stop Mr. Williams from doing anything.  I tried to

7    protect him.  I tried to be on his side, making sure that, you

8    know, he's safe and everybody else is safe around him.  And

9    that's all that I would like to add right now.

10               *THE COURT:*  All right.  Thank you, sir.

11               Mr. Cook, do you wish to make a statement for the

12   government?

13               *MR. COOK:*  Yes, Your Honor.  First of all, I would

14   like to remind the Court and I know the Court is fully aware,

15   but that Mr. Mirza is not here for the actions of Mr. Williams.

16   Mr. Mirza is here for the actions that Mr. Mirza took.

17               The government would ask that a sentence of 360

18   months to life be imposed against the defendant, Mr. Mirza,

19   based on his actions.

20               The government would also remind the Court that

21   pursuant to 18 U.S.C. 3584, sentences given at the same time

22   are presumed to be concurrent.  So, we would ask the Court in

23   its sentence to make specific findings to run them consecutive

24   to get to a guideline sentence.

25               United States Sentencing Guideline 5G1.2 states

1  that if the sentence imposed on the court carrying the highest

2  statutory maximum is less than the total punishment, that a

3  sentence imposed on one or more of the other counts shall run

4  consecutively to get to a guideline sentence.  And that's what

5  we're asking the Court to do.

6           18 U.S.C. 3584 then goes on to state that you

7  look to the factors in 18 U.S.C. 3553 to make a determination

8  as to whether to run those sentences concurrent or consecutive.

9           The government believes in its brief that it's

10  presented a case for that and would like to talk about that

11  briefly.  The defense raises the issue of Mr. -- of the case up

12  in Dallas that just received a 24-month sentence.  That was a

13  case of a single event where the defendant --

14      MR. MCALISTER:  24 year.

15      MR. COOK:  -- 24 year -- you're correct, I'm sorry --

16  24-year sentence.  That was a single event where the defendant

17  in that case thought he was going to blow up a building.

18           This is not single event, as the Court heard

19  during the trial.  This is a two-year series of events in which

20  the defendant participated not as a minor role, not as a minor

21  player, but as a manager, an organizer, and leader of this

22  jamaat or group.  He had the intent to harm people despite what

23  he says today.  Essentially --

24      THE COURT:  What's the basis for your saying that he

25  was the leader of the group?  It started with two other people,

1   didn't it?

2          *MR. COOK:*  That is correct, Your Honor.  However, what

3   we have here essentially is a Pakistani citizen came to the

4   United States on August 24th of 2001 under an F-1 visa student.

5   He entered the college -- he did not enter the college he was

6   admitted to enroll, but instead went to a different university

7   and at that university entered a two-year program.  More than

8   five years later, he had not completed that two-year program

9   and was still in school.

10         During that time period he violated the law by

11  working and paid no taxes and funneled the money through

12  another individual to avoid being caught working and paying

13  those taxes.  He planned, attended, and invited people to at

14  least nine shooting events as set out in the brief on nine

15  different dates, which were designed to train for jihad against

16  the United States, the United States forces in Afghanistan.

17         On each of those dates he possessed weapons in

18  violations of the law.  He himself invited what they call like

19  minded individuals to attend the training camps to train for

20  jihad.  Two of those individuals, Rizbe (phonetic) and Kozy

21  (phonetic) were his own cousins.  He purchased ammunition in

22  support of these trips on at least four different occasions,

23  one of which was presented to the Court in trial at the George

24  R. Brown Convention Center where he purchased a thousand rounds

25  which were used in that training.

1            In his statement he admitted at least four other

2    purchases of ammunition in support of these camping weekends at

3    Carter Country, Academy, and one other location.  I believe it

4    was Wal-Mart actually.  He admitted to the purchase of a

5    firearm in support of his ideas of going jihad from an

6    individual so as to avoid the background check that is

7    incumbent on purchasing a weapon at a regular location, such as

8    Carter Country.

9            He planned to act as the guide for getting the

10   jamaat or group to Pakistan, having the experience in Pakistan,

11   having lived there before.  He would act as their guide once

12   they were in Pakistan on where they were to go, how they were

13   to act, who they were to contact, and to act as a translator,

14   because he spoke the language.

15           He encouraged the donation of funds to the

16   Mujahideen and the Taliban.  He elicited funds for the

17   Mujahideen and the Taliban.  And in some of the tapes that were

18   played for the Court, stated that he collected money from the

19   confidential source, the undercover, codefendant Williams, and

20   add an additional sum of $300 that he had collected throughout

21   the community to those funds.  He was the conduit for getting

22   that money to Afghanistan in support of the Taliban.  He

23   collected the money.  He deposited the money, withdrew the

24   funds, and handed it to a Mr. Badat, who then handed the money

25   to a Mr. Ismail, who were to get the money to Afghanistan and

1  the Taliban.

2              He led these events.  He organized the events.

3  He's the source for getting all the money overseas.  That's why

4  he should be viewed as a manager, organizer, leader, and should

5  be punished in a manner commensurate with what he did, what his

6  role was in this group, again, not a single event, a two-year

7  planned operation to lead individuals against United States

8  forces.

9              He says that he had no intent to harm

10  individuals.  On July 15th, 2005, on camping event number four,

11  the defendant is quoted stating, "The Quran defines jihad as

12  killing or fighting."

13              In another shooting event, the defendant is

14  quoted as saying, "I think we should be ready to go jihad any

15  time now."

16              He led this group or was at least one of the

17  leaders of this group.  We have an individual here who came to

18  this country to take advantage of the opportunities and

19  freedoms that we offer and repaid it by planning to fight

20  against our own forces in support of a foreign terrorist

21  organization.  He planned to do that physically, to kill the

22  forces, and felt that if he couldn't do that at that time would

23  do so by supporting those who were actively fighting in

24  Afghanistan at the time.

25              The government requests that the defendant be

1  sentenced with a guideline sentence of 360 months to life.

2  Thank you.

3        *THE COURT:*  Okay.  Thank you, sir.

4            All right.  I'll state now the sentence the Court

5  intends to impose.  I'll give final opportunity for any legal

6  objections if there are any before it is finally imposed.

7            The Court has considered the advisory guidelines.

8  The Court has also considered the requirements of Section

9  3553(a) that sets forth factors to be considered in imposing a

10 sentence.  The Court is required to impose a sentence

11 sufficient but not greater than necessary to comply with the

12 purposes set forth in Paragraph 2 of Subsection A, and those

13 factors include:  The need to reflect the seriousness of the

14 offense, to promote respect for the law, and to provide just

15 punishment, to afford adequate deterrence to criminal conduct,

16 to protect the public from further crimes of the defendant,

17 and, also, among other things, the need to avoid unwarranted

18 sentence disparities among defendants with similar records who

19 have been found guilty of similar conduct.

20            The Court has taken into account these several

21 factors as well as the history and characteristics of the

22 defendant.  It is, indeed, a mixed history, because while on

23 the one hand we have the offenses that have been committed

24 here, the defendant does have as well a history of giving

25 compassionate aid to those in need, those who are hungry, those

1  who have suffered from natural disasters, such as a hurricane
2  and events of that magnitude.  He has -- those factors, those
3  positive elements have been presented in some of the letters.
4  Also, some of it was presented during the course of the trial
5  by witnesses.
6             The Court's also considered the sentences that
7  have been imposed in other cases, such as -- by which Mr. Adler
8  and Mr. Cook have referred to in Dallas, but other sentences
9  imposed with respect to codefendants in this case who did enter
10 pleas or were found in bench trials to be guilty.
11        *MR. COOK:*  Would the Court like me to address the
12 disparity in sentencing, Your Honor?
13        *THE COURT:*  I did not.  I thought you had made your
14 presentation already.
15        *MR. COOK:*  I just wonder if you wanted to hear on
16 that, Your Honor, what the government's thoughts were.
17        *THE COURT:*  I've also considered the circumstances of
18 this offense -- these offenses, which certainly with respect to
19 the conspiracy to aid the -- make unlawful contributions to
20 benefit specially designated global terrorist organization are,
21 indeed, serious, along with the other conduct that I described
22 previously.  And having weighed all of the factors required to
23 be considered by Section 3553(a), the Court is of the view that
24 it's appropriate in this case to achieve those objectives, to
25 impose a variance sentence, which I shall state as follows,

1  once again, giving an opportunity for any legal objections, if

2  there are any before it is finally imposed.

3              Pursuant to the Sentencing Reform Act of 1984,

4  it's the judgment of the Court that the defendant, Adnan Babar

5  Mirza, is hereby committed to the custody of the Bureau of

6  Prisons to be imprisoned for a term of 60 months as to each of

7  Counts 1S and 2S, followed by a consecutive term of 120 months

8  as to each of Counts 3S through 8S -- no, I should say through

9  9S, Counts 3 through 9.  Now, those counts on 3 through 9 to

10 run concurrently with each other, but consecutive as to the

11 sentence on Counts 1 and 2, for a total term of 180 months.

12             Upon release from imprisonment, the defendant

13 shall be placed on supervised release for a term of three years

14 as to each of Counts 1S through 9S to run concurrently, for a

15 total term of three years.

16             Within 72 hours after release from the custody of

17 the Bureau of Prisons, the defendant shall report in person to

18 the probation office in the district to which the defendant is

19 released.

20             While on supervised release, the defendant shall

21 not commit another federal, state, or local crime; shall comply

22 with the standard conditions that have been adopted by this

23 Court under General Order No. H 1996-10, abide by any mandatory

24 conditions required by law and shall comply with the following

25 additional conditions:  The defendant shall not possess a

1    firearm, ammunition, destructive device, or any other dangerous
2    weapon.
3              If deported, the defendant is not to reenter the
4    United States illegally.  If the defendant is deported during
5    the period of probation or the supervised release term,
6    supervision by the probation office becomes inactive.  If the
7    defendant returns, the defendant shall report to the nearest
8    U.S. probation office immediately.  Supervision by the
9    probation office reactivates automatically upon the defendant's
10   reporting.
11             The defendant shall cooperate in the collection
12   of a DNA sample from the defendant, if the collections of such
13   a sample is authorized pursuant to Section 3 of the DNA
14   Analysis Backlog Elimination Act of 2000.
15             It's further ordered that the defendant shall pay
16   a special assessment to the United States in the amount of $100
17   as to each of Counts 1S through 9S for a total of $900.
18             The Court finds that the defendant does not have
19   the financial ability to pay a fine within the established
20   guideline range but has future earnings capabilities during
21   imprisonment and after release.  The Court, therefore, orders
22   the defendant shall pay to United States a reduced fine of
23   $1,000 as to each of Counts 1S through 9S, for a total of
24   $9,000.
25             Having assessed the defendant's ability to pay,

1   payment of the total criminal monetary penalties shall be due

2   as follows:  Defendant shall make a lump sum payment of $900

3   due immediately.  The balance shall be due in payments of the

4   greater of $25 per quarter or 50 percent of any wages earned in

5   prison in accordance with the Bureau of Prison's inmate

6   financial responsibility.  Any balance remaining after release

7   from imprisonment shall be paid in equally monthly installments

8   of the greater of $200 or 10 percent of gross earnings of the

9   defendant to begin 60 days after date of release to a term of

10  supervision.  Payments to be made through the United States

11  District Clerk, Southern District of Texas.

12          Is there any legal reason why the sentence should

13  not be imposed as stated other than those already stated?

14          MR. COOK:  No, Your Honor, not from the government.

15          MR. ADLER:  No, Your Honor.

16          THE COURT:  Then pursuant to the Sentencing Reform Act

17  of 1984, it's the judgment of the Court that the sentence as

18  stated is imposed upon Defendant Adnan Babar Mirza.

19          Now, Mr. Mirza, you have a right to appeal this

20  matter.  If you cannot afford a lawyer to represent you on

21  appeal and can satisfy the Court that you meet the criteria for

22  the appointment of counsel, I will appoint a lawyer for you.

23  Mr. Adler will advise you of your appeal rights, I'm sure.

24  I'll also give to you this written notice of your appeal rights

25  that you may take with you, and a copy of this will be retained

1    in the court file.

2              Let me say, Mr. Mirza, I have imposed a sentence

3    more lenient than what is called for by the guidelines and I

4    hope I do so without any minimization of the -- my views as to

5    the seriousness of the crimes that you've committed and the

6    activity in which you were engaged.  But, also, I have

7    considered the fact of what you've said and I hope that it's

8    true, that you've never wanted, yourself, to hurt anyone.  To

9    assist others in hurting other people is just as bad.  I hope

10   that you will not do that again.  And I hope that you will when

11   you're released and wherever you may be, that you will live a

12   law abiding and peaceful life, giving expression to those good

13   traits that have been spoken of you and helping others through

14   charitable acts and not preparing to hurt or harm others

15   through violent acts, and I hope that's where you'll choose to

16   take your future.

17             *THE DEFENDANT:*  Your Honor, that has always been my

18   concern.  And like I mentioned before, I have never, never

19   intended to harm anybody.  And what we know today about -- I

20   mean, what we hear today about jihad and stuff, I know that

21   this was created back in the '80s and the '90s to just have a

22   proxy army to fight the Russians by the Pakistani intelligence

23   or the Saudi intelligence.  This is not Islam.  Islam does not

24   teach that, and I believe that.  But I also know that I cannot

25   counter the type of dollars that the Saudi government has --

```
 1    you know, use to promote their ideology, which is harming
 2    practicing Muslims.  And I'm concerned about that, because I do
 3    not want to change my faith, but at the same time I know the
 4    circumstances there.  It very hard to, you know, counter
 5    somebody who's sitting on probably 25 percent of the world's
 6    oil resources.  It's just hard.
 7              THE COURT:  All right.  Anything else?
 8              MR. ADLER:  Briefly, Judge.  I will file the notice of
 9    appeal.  As the Court knows, I'm Court appointed for Mr. Mirza.
10    I will file the notice of appeal, if he instructs me to do so,
11    but I believe he would -- he's going to request a different
12    lawyer for the appeal.  So, I will file that paperwork
13    requesting a different lawyer be appointed for his appeal.
14              THE COURT:  All right.  Thank you.
15              MR. ADLER:  That's all I have, Your Honor.
16              THE COURT:  All right.  Thank you.  Is that all?
17              MR. COOK:  That's all, Your Honor.
18              THE COURT:  All right.  That concludes this hearing.
19         (Concluded at 11:23 a.m.)
20                                * * *
21    I certify that the foregoing is a correct transcript from the
22    record of proceedings in the above-entitled cause, to the best
23    of my ability.
24    /s/ Kathy L. Metzger                    8-27-12
      Kathy L. Metzger                        Date
25    Official Court Reporter
```